**FILED**

July 2 2013

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 11-0291

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 173

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

DANIEL ALVIN PRINDLE,

      Defendant and Appellant.

| | |
|---|---|
| APPEAL FROM: | District Court of the Thirteenth Judicial District, In and For the County of Yellowstone, Cause No. DC 09-0132 Honorable G. Todd Baugh, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

            Penelope S. Strong, Attorney at Law; Billings, Montana

      For Appellee:

            Timothy C. Fox, Montana Attorney General, Mardell Lynn Ployhar, Assistant Attorney General; Helena, Montana

            Scott Twito, Yellowstone County Attorney, Christopher Morris, Deputy County Attorney; Billings, Montana

                              Submitted on Briefs:  April 24, 2013
                                         Decided:  July 2, 2013

Filed:

                                  Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1　Daniel Alvin Prindle (Prindle) appeals from the order of the Thirteenth Judicial District Court, Yellowstone County, denying his motion to withdraw his guilty plea. We affirm, and address the issue:

¶2　*Did the District Court err in denying Prindle's motion to withdraw his plea as involuntarily entered?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3　On the evening of May 1, 2008, Prindle, the driver of a Honda SUV carrying Katie Grant (Grant) and Brianna Coe (Coe) as passengers, inexplicably pulled out in front James Archer (Archer), the driver and sole occupant of a Buick sedan, on a road just outside Billings city limits. Archer's vehicle had the right of way. The front of Archer's sedan struck the side of Prindle's SUV, causing a "T-Bone" style collision. At 7:45 p.m., Montana Highway Patrol Trooper Brian Sampson (Trooper Sampson) was dispatched to the accident. All four individuals involved in the accident were injured and were receiving medical treatment when Trooper Sampson arrived. Archer's injuries required a number of surgeries, and he suffered loss of physical and mental abilities. Grant suffered several injuries including facial scarring, and Coe sustained a traumatic head injury.

¶4　Trooper Sampson's investigation pointed to marijuana use by Prindle as a contributing cause to the collision. Trooper Sampson was unable to speak to Archer and Coe at the scene because they were being transported for surgery, but was able to talk to Grant. Grant had previously told medical responders that she and Prindle had ingested marijuana a

2

couple hours before the accident. Grant confirmed this statement to Trooper Sampson and added the detail that she and Prindle had smoked "a couple bowls" of marijuana. Grant was then taken to the hospital where Trooper Sampson resumed his questioning. Grant said she and Prindle smoked marijuana "right after [she] got out of school." Grant's parents were present, and Grant's father received Trooper Sampson's permission to retrieve Grant's cell phone and purse from Prindle's car, which had been towed from the scene. When looking for these items, Grant's father discovered a marijuana pipe and scale on the floorboards of Prindle's SUV. The pipe and scale were taken as evidence.

¶5 The State charged Prindle with three counts of negligent vehicular assault, one count of criminal endangerment, and one count of driving while suspended. Matthew Claus (Claus) was appointed as Prindle's public defender.

¶6 Claus investigated the State's case against Prindle. Through discovery, he received police reports and diagrams, medical records and other documents. He made copies of these documents for Prindle, and mailed him additional discovery as it was received from the State. Claus met with Prindle on numerous occasions in his office to discuss the case and communicated with Prindle by telephone. During these conversations, Prindle repeatedly voiced interest in pleading guilty if he could receive a suspended or deferred sentence rather than taking the case to trial whereafter, if convicted, he could face prison time. Prindle told Claus his sole memory of the evening of the accident was that he was the driver, and said he only knew what had happened from talking to Grant and his mother.

3

¶7    Claus interviewed Grant and Prindle's mother. Grant explained that she had met up with Prindle after school at a grocery store. From there, they picked up Prindle's mother from work and dropped her off at home. Then they picked up marijuana, and drove around smoking a "blunt" for roughly a half hour before heading to Coe's house, where she and Coe "split a beer." The accident occurred shortly after they left Coe's house. Grant said that she did not think Prindle was under the influence of marijuana at the time of the accident. Prindle's mother said she did not think Prindle appeared under the influence of marijuana when he picked her up at approximately 5:00 p.m. However, unlike Grant's account, Prindle's mother said Prindle was alone when he picked her up.

¶8    Claus discussed this information with Prindle. Prindle asked Claus to find out how long the impairing effects of marijuana lasted. Claus found an article published by the National Highway Traffic Safety Administration (NHTSA Article) explaining that marijuana users' motor skills, behavior, perception and cognition were typically impaired for three to five hours after ingesting the drug.

¶9    Claus and Prindle met again to discuss the strengths and weaknesses of the State's case and assess a plea offer from the State. Claus explained the State's case was not the strongest, but there was still sufficient evidence for a jury to find him guilty based on Grant's testimony of his marijuana use in the hours preceding the accident. The State's plea offer was for a suspended sentence recommendation, so Prindle asked Claus to see if the State would agree to recommend a deferred sentence. Claus made the counter offer to the State, and the State agreed. Prindle would plead guilty to one count of negligent vehicular assault

4

and driving while suspended; in return, the State would dismiss the other charges and recommend a six-year deferred sentence on the remaining negligent vehicular assault charge.

¶10 During the summer of 2010, Prindle moved to Oregon to pursue a career in snowboarding. On August 24, 2010, Prindle signed the plea agreement and appeared for a change-of-plea hearing. He hand-wrote on the plea agreement that he was pleading guilty because: "On May 1st, 2008, I drove my vehicle o[n] marijuana and negligently caused serious bodily injury to James Archer, Brianna Coe, and Kati[e] Grant in Yellowstone County." Prindle also acknowledged in the agreement that the court was not obligated to accept the agreement and could instead sentence him to different terms. At the change-of-plea hearing, the judge asked if Prindle understood that the court did not have to accept the plea agreement's recommended sentence and that Prindle could receive the maximum penalty of 10 years in prison. Prindle said he understood, and stated he was satisfied with Claus's work. Prindle then pled guilty, and his sentencing hearing was set for a later date. In the meantime, Prindle returned to Oregon.

¶11 In January 2011, Prindle returned to Montana for his sentencing hearing. The District Court sentenced Prindle in accordance with the plea agreement. Prindle expected to immediately return to Oregon, but when he reported to his probation officer, he was informed that protocol required Prindle to complete 90 days on supervision "without issues" before he was permitted to leave Montana. Prindle filed a notice of appeal on May 19, 2011, but then moved the District Court for leave to withdraw his plea. Prindle filed an unopposed

5

motion with this Court to remand the matter to the District Court to adjudicate his motion to withdraw. This Court granted the motion.

¶12 The District Court held a hearing on Prindle's motion and took testimony from several witnesses. Prindle's mother testified but provided no new relevant information. Prindle testified that he would have gone to trial if he had known just how weak the State's case was or had Claus not incorrectly assured him there was "no reason" why he would not be able to immediately return to Oregon. Prindle further alleged that during the August 24, 2010 change-of-plea hearing, he had informed the judge that Claus had told him he would be able to return to Oregon.

¶13 Prindle also called Dr. Jennifer Souders (Dr. Souders), an expert on impairment due to marijuana use, to opine that Claus should have hired an expert to determine whether Prindle was still under the influence of marijuana at the time of the accident. While Dr. Souders criticized the NHTSA Article used by Claus for academic shortcomings,[1] she agreed with its conclusion that, for driving purposes, impairment from marijuana generally lasts around three hours.

¶14 Claus testified about his representation of Prindle. Claus stated that the critical issue in the case was the timing of Prindle's marijuana use. He said he recognized the conflict between Grant's statement that she and Prindle had smoked marijuana after taking Prindle's mother home *together* and Prindle's mother's statement that Prindle was *alone* when he took

6

her home. He also recognized that Grant's recollection of when she and Prindle smoked had changed from "right after school" to after taking Prindle's mother home. Claus believed, however, that a jury would most likely resolve this conflict by concluding that Grant had smoked marijuana with Prindle after Prindle left his mother's house. This placed Prindle within the three-hour window of impairment discussed in the NHTSA Article. Claus explained that he had not conducted further interviews primarily because Prindle did not want to go to trial and a deferred sentence was therefore his best option.

¶15 The District Court entered findings of fact, conclusions of law and denied Prindle's motion to withdraw his plea on May 30, 2012. The court concluded that Prindle's plea was entered voluntarily because Claus never promised that Prindle would be allowed to reside in Oregon and Claus had conducted adequate research to advise his client concerning marijuana impairment. Prindle appeals.

## STANDARD OF REVIEW

¶16 The ultimate question of whether a plea is voluntarily made is a mixed question of law and fact. *State v. Brinson*, 2009 MT 200, ¶ 3, 351 Mont. 136, 210 P.3d 164. Consequently, we review a district court's ultimate denial of a motion to withdraw a guilty plea de novo. *Brinson*, ¶ 10. However, we review the district court's underlying factual findings regarding the voluntariness of the plea to determine if they are "clearly erroneous." *State v. Warclub*, 2005 MT 149, ¶¶ 22-24, 327 Mont. 352, 114 P.3d 254.

---

[1] Dr. Souders took issue with the Article because it was not peer-reviewed and she felt that its conclusion that some "psychological impairment" lasts up to 24 hours after

**DISCUSSION**

¶17 Montana law permits a defendant to withdraw his guilty plea within one year of final judgment for "good cause." Section 46-16-105(2), MCA. Good cause exists when the defendant's plea was involuntarily entered. *Warclub*, ¶ 16.[2] A plea must be voluntary because the defendant is waiving his constitutional rights to not incriminate himself and to a trial by jury. *Brady v. U.S.*, 397 U.S. 742, 748, 90 S. Ct. 1463, 1468-69 (1970). We utilize the *Brady* standard to determine if a plea was voluntarily made:

> "A plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper to the prosecutor's business."

*Warclub*, ¶ 18 (quoting *Brady*, 397 U.S. at 755, 90 S. Ct. at 1472). "'Where a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases.'" *State v. McFarlane*, 2008 MT 18, ¶ 11, 341 Mont. 166, 176 P.3d 1057 (quoting *Hans v. State*, 283 Mont. 379, 411, 942 P.2d 674, 693 (1997) (citing *Hill v. Lockhart*, 474 U.S. 52, 56, 106 S. Ct. 366, 369 (1985)).

---

ingesting marijuana was "overstated."

[2] In *State v. Lone Elk*, 2005 MT 56, ¶¶ 17-19, 326 Mont. 214, 108 P.3d 500 (overruled on other grounds by *Brinson*, ¶ 9), we concluded that the "good cause" standard included not only the constitutionally-required voluntariness inquiry but possibly other

Thus, applying the test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), a defendant seeking to withdraw his guilty plea because he received ineffective assistance must show: "(1) that his counsel's advice fell outside the range of competence demanded of a criminal attorney, and (2) but for counsel's deficient performance, he would not have entered a guilty plea." *McFarlane*, ¶ 11 (citing *Hans*, 283 Mont. at 410-11, 942 P.2d at 693); *Hill*, 474 U.S. at 57-59, 106 S. Ct. at 369-70.

¶18 *Did the District Court err in denying Prindle's motion to withdraw his plea as involuntarily entered?*

¶19 Prindle argues that his guilty plea was involuntary for three reasons. First, he asserts that Claus provided ineffective assistance when investigating his case because he failed to retain an expert on marijuana impairment and failed to interview certain witnesses. These omissions, Prindle asserts, led Claus to overestimate the strength of the State's case, which, in turn, caused Prindle to plead guilty instead of going to trial. Second, Prindle claims that Claus failed to inform him that Negligent Endangerment was a lesser-included offense of Negligent Vehicular Assault. Third, Prindle asserts that Claus improperly told him that he would be permitted to immediately return to Oregon if he pled guilty.

### A. Ineffective Assistance of Counsel

¶20 In *State v. Thomas*, 285 Mont. 112, 117-18, 946 P.2d 140, 143 (1997), we adopted the *Strickland* standard for analyzing a criminal counsel's duty to investigate. *Strickland* held that "counsel has a duty to make reasonable investigations or to make a reasonable decision

---

criteria. *Accord Warclub*, ¶ 16 ("'Good cause' includes the involuntariness of the plea, but it

that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066; *Thomas*, 285 Mont. at 119, 946 P.2d at 144. In turn, whether an investigation is "reasonable" will depend in part on the client's goals:

> "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information."

*Thomas*, 285 Mont. at 117-18, 946 P.2d at 143 (quoting *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066). Thus, a defendant's intent to plead guilty narrows the scope of investigation necessary to be "reasonable." *Smith v. Mahoney*, 611 F.3d 978, 987 (9th Cir. 2010) ("Smith's intent to plead guilty mitigated, but did not eliminate, his attorney's duty to reasonably investigate."). The pertinent question is, based on the defendant's particular goals, did counsel "familiarize him- or herself sufficiently with the facts of the defendant's case to make an informed recommendation regarding a plea bargain." John M. Burkoff & Nancy M. Burkoff, *Ineffective Assistance of Counsel*, § 6.5 at 238 (West Publ. Co. 2011 ed.); *cf. Lone Elk*, ¶ 23 (reasoning that "case-specific considerations" determine whether a plea is voluntary); *Warclub*, ¶ 19 (same); *McFarlane*, ¶ 17 (same).

¶21 *Thomas* and *Strickland* direct that the reasonableness of Claus's investigation is judged in light of Prindle's desire to avoid trial. The record demonstrates that from the

---

may include other criteria.").

outset Prindle was definite about avoiding the risk of prison time by obtaining a plea agreement with a suspended or deferred sentence. Claus followed Prindle's directive, and undertook plea negotiations with the State. He was successful in obtaining a deal by which Prindle ultimately received a deferred sentence.

¶22     Given Prindle's goals, Claus became sufficiently familiar with the facts of the case to make an informed recommendation that Prindle should plead guilty. Claus reviewed Trooper Sampson's investigative reports, which memorialized Grant's statement at the accident scene that she had smoked "a couple bowls" of marijuana with Prindle before the accident. Claus listened to Trooper Sampson's recorded interview of Grant at the hospital, where she again admitted to smoking marijuana with Prindle. Claus independently interviewed Grant, who again confirmed she smoked marijuana with Prindle during the hours leading up to the accident. There was other objective evidence of Prindle's marijuana use: the marijuana pipe and scale found on the floorboards of his SUV. Claus prudently advised Prindle that based on this evidence, a jury could find him guilty of all four counts of negligent vehicular assault and he could face prison time for the convictions. Claus's advice to Prindle to plead guilty in exchange for a deferred sentence was very reasonable.

¶23     Prindle alleges that Claus was required to interview the other victims, Archer and Coe, and Coe's family members "who were present in their home with Mr. Prindle for at least an hour before the accident." However, the record does not indicate what these witnesses would have said. Contrary to Prindle's assertion, there is nothing in the record to show that Coe's family members were even at home when Prindle and Grant were there.

Neither Coe nor any member of her family testified at the plea withdrawal hearing. "In cases where counsel fails to conduct adequate pretrial investigation we focus our inquiry as to what information would have been obtained from such investigation and whether such information would have produced a different result." *Weaver v. State*, 2005 MT 158, ¶ 21, 327 Mont. 441, 114 P.3d 1039 (citing *State v. Denny*, 262 Mont. 248, 255, 865 P.2d 226, 230 (1993)). Without knowing what testimony Prindle's witnesses would have provided, Prindle cannot demonstrate that Claus's failure to interview them prejudiced his decision to plead guilty. *Weaver*, ¶¶ 7, 16, 21-23 (Weaver failed to "carry his burden" of establishing his counsel's failure to interview "potential alibi witnesses, other suspects, and persons who allegedly heard confessions by persons other than Weaver" prejudiced his murder trial when he did not have those witnesses testify at hearing).

¶24 Prindle's assertion that Claus should have hired an expert on marijuana impairment has a similar defect. The NHTSA Article used by Claus concluded that, for driving purposes, a person is impaired for three to five hours after ingesting marijuana. Prindle's expert, Dr. Souders, agreed that a marijuana user is generally impaired for three hours. Grant said she and Prindle drove around smoking for roughly a half hour after taking Prindle's mother home from work. Prindle's mother's work shift ended at 5:00 p.m., and Trooper Sampson was dispatched to the accident at 7:45 p.m. Thus, there was evidence to establish that Prindle's marijuana use was within the three hour window of impairment, a point on which the NHTSA Article and Dr. Souders agreed. Prindle has failed to demonstrate how

12

hiring an expert who offered such a similar conclusion would have prompted him to reject the plea offer and proceed to trial.

¶25 Prindle's assertions that Claus should have interviewed certain witnesses and retained an expert on marijuana impairment fail to satisfy *Strickland*'s prejudice prong. Even if we were to determine that a competent defense attorney would have performed these tasks, Prindle has failed to demonstrate how interviewing the witnesses or hiring a marijuana expert would have changed his mind about pleading guilty. *McFarlane*, ¶ 11.

¶26 Next, Prindle argues that Claus provided ineffective assistance because he failed to tell him that Negligent Endangerment is a lesser-included offense of Negligent Vehicular Assault. He correctly points out that a plea may be involuntary if the defendant is not informed of a lesser-included offense. *See State v. Sanders*, 1999 MT 136, ¶ 22, 294 Mont. 539, 982 P.2d 1015 (overruled on other grounds by *State v. Deserly*, 2008 MT 242, ¶ 12 n. 1, 344 Mont. 468, 188 P.3d 1057). However, the record leaves no doubt that Prindle was informed that Negligent Endangerment was a possible lesser-included offense to his charges. On the first page of Prindle's plea agreement, he acknowledged that Claus explained to him and advised him that Negligent Endangerment was a lesser-included offense of his charges. During the August 24, 2010 change-of-plea hearing, the District Court asked Prindle if he was still willing to plead guilty after being informed that a jury could find him guilty of the lesser-included offense of Negligent Endangerment. Prindle responded, "Yes, sir." Prindle's argument on this point has no merit.

13

¶27 The District Court correctly concluded that Prindle failed to demonstrate Claus rendered ineffective assistance.

    **B.    Prindle's Expectation He Could Immediately Return to Oregon Following Sentencing**

¶28 The District Court ruled that Prindle's plea was not involuntary on this ground because no "promise" was made to Prindle that he would be allowed to return to Oregon following his sentencing, noting that "the possibility always existed that the Court could impose a sentence of incarceration." Prindle argues that the District Court's conclusion misses the "salient point" that Prindle's plea was involuntary because he was led to "reasonably believe" he would be allowed to return to Oregon. In other words, Prindle argues that his plea was involuntary because Claus wrongly predicted a consequence of pleading guilty.

¶29 "A guilty plea is not voluntary if induced by misrepresentation, including an unfulfilled promise." *Lepera v. U.S.*, 587 F.2d 433, 436 n. 4 (9th Cir. 1978) (citing *Brady*, 397 U.S. at 755, 90 S. Ct. at 1472); *accord State v. Valdez-Mendoza*, 2011 MT 214, ¶ 16, 361 Mont. 503, 260 P.3d 151 (defense counsel's statements that defendant could not receive a fair trial based on race or ethnicity was a misrepresentation that rendered guilty plea involuntary). An erroneous prediction by defense counsel can rise to the level of a misrepresentation. *See e.g. Iaea v. Sunn*, 800 F.2d 861 (9th Cir. 1986). However, not all erroneous predictions by defense counsel rise to the level of misrepresentation contemplated

14

by *Brady* or *Strickland*, as explained by the Ninth Circuit Court of Appeals in *Iaea*. *Iaea*, 800 F.2d at 865.

¶30    In *Iaea*, the defendant was charged with eleven felonies and one misdemeanor. *Iaea*, 800 F.2d at 862.  Defense counsel urged Iaea to plead guilty because "his chances of acquittal were slight and that if he was convicted, he would be subject to Hawaii's minimum sentencing law," "there was a good chance of his getting probation if he accepted the plea bargain," and "the chance of his getting an extended sentence was 'almost zero.'" *Iaea*, 800 F.2d at 863.  Relying on this advice, Iaea pleaded guilty.  He was sentenced to life in prison. *Iaea*, 800 F.2d at 863.  The Ninth Circuit reasoned that Iaea's counsel's performance was deficient because his erroneous predictions were numerous and serious: counsel seriously erred in informing Iaea that he could avoid Hawaii's minimum sentencing statute only if he pled guilty because the relevant version of Hawaii's minimum-sentencing statute did not apply to Iaea; counsel's advice that the likelihood of Iaea's receiving an extended or a life sentence was "practically non-existent" and that he might receive probation was flawed; and counsel was aware that the prosecutor was seeking an extended sentence. *Iaea*, 800 F.2d at 864-65.  The court held "[t]hough a mere inaccurate prediction, standing alone, would not constitute ineffective assistance, the gross mischaracterization of the likely outcome presented in this case, combined with the erroneous advice on the possible effects of going to trial, falls below the level of competence required of defense attorneys." *Iaea*, 800 F.2d at 865 (internal citations omitted).

15

¶31    In *Womack v. Del Papa*, 497 F.3d 998, 1003-1004 (9th Cir. 2007), Womack was charged with two counts of attempted murder with a deadly weapon, three counts of first degree kidnapping of a minor with use of a deadly weapon, and one count each of burglary, forgery, and possession of a credit or debit card without cardholder consent. *Womack*, 497 F.3d at 1000.    Relying on defense counsel's advice that the judge would impose the minimum sentence for each count—meaning he would receive 30 to 40 years in prison—the defendant pled guilty. *Womack*, 497 F.3d at 999.    Womack was sentenced to eight life terms without the possibility of parole. *Womack*, 497 F.3d at 999.    Womack moved to withdraw his guilty plea, asserting his attorney's advice was a "'gross mischaracterization of the likely outcome' that fell below the level of competence required of defense attorneys." *Womack*, 497 F.3d at 1002 (quoting *Iaea*, 800 F.2d at 865).    The Ninth Circuit disagreed, reasoning the case was distinguishable because, unlike the defendant in *Iaea*, Womack was not reluctant to plead guilty, and Womack's attorney's incorrect advice did not rise to the level of grossly erroneous as in *Iaea*. *Womack*, 497 F.3d at 1003 ("there is no other evidence in the record that would elevate Womack's attorney's prediction to the level of Iaea's counsel's patently erroneous advice.").

¶32    Here, Prindle's claim falls comfortably on the *Womack* end of the spectrum.  Prindle points us to statements in the record that demonstrate that Claus predicted Prindle would be able to serve probation in Oregon. *See Brinson*, ¶ 12 (a defendant's allegation that his plea was based on a misrepresentation "must be supported by objective proof in the record.").  However, even assuming that Claus's statement that he saw "no reason" why Prindle could

16

not immediately commence serving his probation in Oregon was incorrect, that error constitutes a "mere inaccurate prediction," and not a "gross mischaracterization of the likely outcome." Unlike *Iaea*, and even *Womack*, where the defendant's lawyer predicted leniency but the court imposed life sentences, Prindle received the sentence agreed upon in the plea agreement. A failure to accurately predict that Prindle would have to complete 90 days in Montana on good behavior before returning to Oregon does not rise to the level of gross mischaracterizations present in *Iaea*. And, unlike *Iaea*, Prindle was not reluctant to plead guilty—he affirmatively directed Claus to pursue a favorable plea agreement so he could avoid the risk of incarceration.

¶33 The District Court correctly concluded that Prindle's plea was not involuntarily entered.

¶34 Affirmed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ MICHAEL E WHEAT

17